**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINE P. CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14-1498** |
| | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

### I.      Introduction

Plaintiff Christine P. Carter ("Carter") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434, 1381-1383f, respectively.  The matter is presently before this Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.  (ECF Nos. 10 & 13).  The record has been developed at the administrative level.[1]  For the reasons that follow, Carter's motion for summary judgment (ECF No. 10) will be denied, the Commissioner's motion for summary judgment (ECF No. 13) will be granted, and final judgment will be entered in favor of the Commissioner and against Carter.

---

[1] All references to the administrative record, (ECF No. 6), will be cited in the following format: (R. at p. xx).

## II.    STATEMENT OF THE CASE

### A.    Procedural History

Carter filed an application for DIB benefits on December 6, 2011 and one for SSI benefits on January 6, 2012, both alleging that he had become "disabled" on July 25, 2010. (R. at pp. 192, 199). Both of these applications were initially denied on February 1, 2012. (R. at pp. 137-46). Carter responded on February 13, 2012 by filing a request for an administrative hearing, (R. at p. 147), which was then scheduled for February 14, 2013. (R. at p. 159). Prior to this hearing, Carter's counsel submitted a written "request for a Psychological Consultative Evaluation". (R. at p. 185).

The hearing was held on its scheduled date in Pittsburgh, Pennsylvania, before Administrative Law Judge ("ALJ") Guy Koster. (R. at pp. 67-106). Carter testified at the hearing, represented by counsel. (R. at pp. 70-100). Samuel E. Edelmann ("Edelmann"), an impartial vocational expert, also provided testimony concerning the expectations of employers existing in the national economy. (R. at pp. 100-06). In a decision dated March 15, 2013, the ALJ determined that Carter was not "disabled" within the meaning of the Act. (R. at p. 48). Following her receipt of the ALJ's decision, Carter filed a request for its review with Appeals Council on April 4, 2013. (R. at p. 47). This request was denied on September 4, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at pp. 1-7). Carter commenced this action on November 4, 2014, seeking judicial review of the Commissioner's decision. (ECF No. 2). Carter and the Commissioner filed cross-motions for summary judgment on February 12, 2015 and March 12, 2015, respectively, (ECF Nos. 10 & 13), each also filing a brief in support thereof, (ECF Nos. 12 & 14). Carter also filed a concise statement of material facts

along with her motion, (ECF No. 11), and subsequently filed a reply brief on October 27, 2014, (ECF No. 15). These pending motions for summary judgment are now ripe for disposition.[2]

## B. General Background

Carter was born on March 24, 1973, making her thirty-seven years of age on her alleged disability on-set date and thirty-nine years of age at the time of the hearing. (R. at pp. 70, 192). She is a high school graduate who has attended one year of college. (R. at p. 70). She is married and lives with her husband. (Id.). Carter is the mother of two adult children who now both live outside of her home. (R. at p. 90).

Carter has not worked since July 25, 2010, when she quit her job as a presser at a drycleaner. (R. at p. 71). Prior to that job, which she performed for approximately seven years, she had worked as a data entry clerk for about eight years. (R. at pp. 71-74). Carter says she stopped working in 2010 because she could no longer perform her job due to pain caused by fibromyalgia. (R. at p. 74). In her applications for benefits, Carter alleged disability based on fibromyalgia, back problems, and chronic pain. (R. at p. 226). At the hearing, she alleged additional impairments of anxiety, bipolar disorder, and tremors. (R. at pp. 74-75, 84-91, 93-100).

## C. Medical History

Carter's past surgical history consists of arthroscopic surgery on both shoulders to remove bone spurs in 2007 and 2009, carpal tunnel surgery on the right hand in 1998, and tubal ligation in 1995. (R. at p. 463). Relevant to the present inquiry, Carter was seen on February 22,

---

[2] The Court acknowledges that judicial review under the Act is not governed by the standards generally applicable under Federal Rule of Civil Procedure 56. Banks v. Shalala, 43 F.3d 11, 13-14 (1st Cir. 1994); Flores v. Heckler, 755 F.2d 401, 403 (5th Cir. 1985). In this context, the procedure typically employed at the summary-judgment stage of litigation "merely serves as a convenient method under which both parties may present appropriate briefs in support [of] and in opposition to the[ir] respective positions." Sumler v. Bowen, 656 F.Supp. 1322, 1330 (W.D. Ark. 1987).

2010 by her then primary care physician Dr. Michael Gates ("Gates").  (R. at p. 337).  She

reported experiencing pain all over her body.  (Id.).  After an examination in which Carter was

sensitive "to palpitation at multiple trigger points," Gates assessed her as having "myalgias" and

prescribed Prednisone.  (Id.).  When Carter reported that she was "getting worse" at a March 23,

2010 follow-up appointment, Gates appears to have prescribed Mobic and Oxycodone to treat

her pain.  (R. at p. 336).  Gates saw Carter again on April 16, 2010 and prescribed Fentanyl

patches to treat her "chronic pain."  (R. at p. 335).

Gates referred Carter to Heritage Valley Rheumatology, where she was seen by Dr. Atac

Turkay ("Turkay") on April 28, 2010.  (R. at 463).  Carter conveyed her belief that her current

medications, including Mobic and Fentanyl, "do not help."  (R. at p. 464).  Turkay noted that

Carter refused to sit during the interview portion of the visit, citing too much hip and tailbone

pain, although "she was able to sit on the examination table throughout the exam" portion.  (Id.).

Following the examination, Turkay explained that Carter did "not have any particular tender

points to suggest fibromyalgia syndrome."  (Id.).  Instead, he believed she was suffering from

bilateral trochanteric bursitis, which he treated by injecting the bursae with steroids.  (Id.).

Turkay saw Carter "for a follow-up regarding her arthralgias" on May 4, 2010.  (R. at p. 461).

This appointment took place sooner than anticipated due to Carter's report that her pain had

gotten worse after the injections.  (Id.).  After this examination, Turkay reported that he didn't

"see any clear reason why the patient would have the extent of pain that she complains about."

(Id.).  Instead, he speculated that "[t]his is more likely due to a pain syndrome."  (Id.).  Turkay

detailed additional diagnostic steps that he intended to take, but there is no record that these steps

were ever completed.  (Id.).

Carter returned to Gates for a follow-up visit on May 17, 2010. (R. at p. 309). She complained of "pain all over," but explained that "Fentanyl helps." (Id.). Gates noted "multiple tender points" and diagnosed Carter as having fibromyalgia, which would be treated with Savella. (R. at pp. 309-10). Gates then refilled Carter's prescription for Oxycodone on May 31, 2010, (R. at p. 312), and additionally prescribed Gabapentin at an appointment on June 8, 2010 after Carter reported she continued to have pain all over, (R. at p. 311). Gates then made a couple medication changes during Carter's appointment on July 8, 2010, replacing Savella with Lyrica and increasing the dosage of Fentanyl. (R. at p. 313). On July 28, 2010, Gates referred Carter to Dr. Mark R. LoDico ("LoDico") at Advanced Pain Medicine. (R. at p. 314).

LoDico first saw Carter on September 2, 2010. (R. at p. 374). He diagnosed her as having "[t]otal body pain associated with fibromyalgia." (R. at p. 375). LoDico's recommended course of action included the following: (1) a comprehensive sleep study, (2) a psychological consultation regarding chronic pain coping skills, (3) starting physical therapy, (4) discontinuing Mobic in favor of Celebrex, (5) discontinuing oxycodone in favor of controlling pain with more frequent applications of Fentanyl and Tylenol, and (6) various diagnostic tests. (Id.).

That same day, LoDico referred Carter to the Centers for Rehab Services to engage in physical therapy. (R. at p. 290). Between September 14, 2010 and October 13, 2010, Carter took part in physical therapy with Allison Kleiner ("Kleiner") on nine separate occasions. (R. at pp. 281-82). Treatment notes consistently reflect that Carter was "still in pain and fatigued," although Kleiner noted after Carter's 8th visit on October 11, 2010 that "[a]ll strength has improved as has flexibility." (R. at p. 285). Upon discharge from therapy, Carter's pain was still "objectively measured" at between six and nine out of ten. (R. at p. 283). While all of Carter's

treatment goals were "not met," Kleiner noted "[s]hort term goals met – chronic pain D/O, can self manage at home  Formal therapy no longer needed."  (Id.).

On September 28, 2010, Carter returned to Advanced Pain Medicine, this time seeing Dr. Lloyd G. Lamperski ("Lamperski").  (R. at p. 378).  She told Lamperski that the more frequent application of Fentanyl had given her more control of her pain, although relief varied.  (Id.). Lamperski noted an impression of "Suspected fibromyalgia" among other possible causes of Carter's pain, which she rated at a six.  (Id.).

Carter underwent an MRI of her lumbar spine on November 1, 2010 (the "November 1 MRI").  (R. at p. 317).  Relevantly, the test showed "moderate canal stenosis at L5S1 level secondary to disc bulge and ligamentous facetal hypertrophy."  (R. at p. 318).  There also "appear[ed] to be a small tear in the posteric disc annalus at this level."  (Id.).  Finally, a "transitional vertebral body [was] labeled as S1."  (Id.).  Carter saw Gates that same day, and he prescribed Cymbalta, although the records do not reflect his reason for prescribing it.  (R. at pp. 316, 349).

Carter returned to Lamperski for a follow-up appointment on November 15, 2010.  (R. at p. 381).  Carter reported "no new areas of pain," although her pain level had increased over the last two to three weeks and was now at a nine.  (Id.).  Lamperski increased Carter's dosage of Fentanyl while noting Gates' addition of Cymbalta.  (Id.).  He did not yet have the results of Carter's November 1 lumber MRI, but did review results of an MRI of the cervical spine and EMG nerve conduction studies conducted on September 16, 2010.  The tests "revealed bilateral C6 radiculopathy without new or active denervation" and "left L4 radiculopathy without new or active denervation."  (Id.).  Pending his review of Carter's lumber MRI, Lamperski recommended "interlaminar lumbar epidural steroid injections" followed, if necessary, by

"[t]ransforaminal lumbar epidural steroid injections, then lumbar facet nerve blocks, then consider diskogram" before attention would be directed to Carter's cervical spinal pain. (Id.). Carter explained to Lamperski that hip injections had not helped her in the past. (Id.).

Lamperski performed an "[i]nterlaminar lumbar epidural steroid injection at L 3-4" on December 2, 2010, which Carter tolerated well. (R. at p. 385). This procedure was repeated on December 16, 2010; this time "at L5-S1." (R. at p. 387). At a follow-up appointment on January 3, 2011, Lamperski noted that neither of these injections gave Carter any relief. (R. at p. 388). Lamperski reviewed the results of the November 1 MRI and arranged for Carter to return in six weeks to discuss next steps. (R. at pp. 388-89). However, Carter was forced to put her treatment on hold for a period of just over five months due to losing her health insurance in mid-January. (R. at p. 391).

When Carter's insurance was reinstated and she was able to report back to Gates on June 14, 2011, she explained that she was in a lot of pain, and had been "off all meds since February." (R. at p. 345). As a result, Gates resent Carter's prescriptions for Fentanyl, Cymbalta, Lyrica, and Mobic. (Id.). Carter was then referred to Dr. Duke Thomas ("Thomas") for further evaluation on July 5, 2011. (R. at p. 397). Thomas diagnosed Carter with spinal stenosis, low back pain, and some degenerative disc disease. (Id.). Thomas recommended that Carter continue with current non-surgical treatments, as "doing a 5-1 decompression and fusion would give her approx.. 40% relief." (Id.).

Carter then returned to Lamperski on July 26, 2011, when he altered her Fentanyl dose. (R. at p. 391). At her next visit to Advanced Pain Medicine on August 31, 2011, LoDico recommended that she undergo a "transforaminal lumbar epidural steroid injection," (R. at p. 394), which he performed on September 30, 2011, (R. at p. 398). Carter again reported that this

treatment was ineffective at her next visit with LoDico on November 11, 2011.  (R. at p. 371).

LoDico recommended proceeding "with diagnostic lumbar facet nerve block and subsequent

rhizotomy in the future."  (R. at p. 372).  LoDico also ordered bloodwork to evaluate for

infection.  (R. at p. 371).  When Carter had failed to have this bloodwork done before her next

visit with him on December 9, 2011, LoDico informed her that her failure to do so prior to her

next scheduled visit would result in her being tapered off of narcotics.  (R. at p. 368).  Although

Carter reported that Fentanyl was now "not helping her at all," LoDico continued to recommend

the same treatment plan.  (Id.).  At this point, Carter stopped treating with Advanced Pain

Medicine, citing disagreement with the treatment they were giving her.  (R. at p. 78).

On December 6, 2011, just prior to Carter's last visit with LoDico, she attended an

appointment with Gates.  (R. at p. 347).  During this visit, Gates increased Carter's dosage of

both Lyrica and Cymbalta, (id.), and also completed a "Physical Residual Functional Capacity

Questionnaire," (R. at pp. 325-30)  In it, Gates noted that he had been treating Carter every three

weeks for five years.  (R. at p. 326).  He characterized Carter's prognosis as "poor."  (Id.).  He

identified depression and anxiety as psychological conditions affecting Carter's condition.  (R. at

p. 327).  Specifically, he represented that Carter was "[i]ncapable of even 'low stress' jobs, could

only sit or stand for five minutes at a time and for less than two hours in an eight hour work day,

could only rarely lift less than ten pounds, and would miss more than four days of work per

month due to her impairments.  (R. at pp. 327-29).  Gates summarized that Carter was "unable to

do any activity as pain requires frequent position changes [and] laying [sic] down."  (R. at p.

330).

On January 24, 2012, Dr. Paul Reardon ("Reardon"), a state reviewing physician,

completed an assessment of Carter's physical residual functional capacity.  (R. at pp. 121-23).

Reardon found that Carter could occasionally lift twenty pounds, could frequently lift ten pounds, could stand for a total of four hours, and could sit for about six hours, with normal breaks, as part of an eight hour work day. (R. at p. 121). Further, Carter could perform all postural activities occasionally, although she should avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibration, and hazards. (R. at p. 122). Three days later, Erin Urbanowicz ("Urbanowicz"), a state reviewing psychiatrist, complete a "Psychiatric Review Technique assessment." (R. at p. 120). Urbanowicz found that no medically determinable mental impairments were established. This was so because of the absence of any formal mental health diagnosis in Carter's file, even though some medical evidence of record "indicates that pain has affected mood." (Id.).

Carter's treatment with Gates proceeded uneventfully until May 11, 2012, when Carter reported to him that for the past one or two months she had felt "on edge" and "jittery" all the time, with her heart and mind racing. (R. at p. 438). Gates assessed Carter to be suffering from "Anxiety/palpitations," (id.), and sought authorization to prescribe Seroquel, (R. at p. 442). Carter returned to Gates on June 11, 2012, and disclosed that she was experiencing mood swings and suicidal thoughts and feeling like she was going to "freak out." (R. at p. 443). Gates prescribed Lithium to treat these symptoms. (Id.). Late that same month, Carter reported that the Lithium was helping with no side effects. (R. at p. 445).

At her six-month follow-up appointment with Gates on December 11, 2012, Carter continued to report being in pain. (R. at p. 447). Gates noted that Carter had a history of fibromyalgia and bipolar disorder, with no mention of anxiety/palpitations. (Id.). Gates further noted "episodes of mania" for which "Lithium helps." (Id.). As such, Lithium was to remain part of the treatment plan, supplemented by Klonopin. (Id.).

On January 15, 2013, Carter presented to the emergency department of the Heritage Valley Sewickley Hospital ("Sewickley Hospital") reporting suicidal thoughts. (R. at p. 469). She was evaluated by Christine Myers ("Myers"). (R. at pp. 485-93). During that evaluation, Carter reported that she wanted to take all her meds because she feels like a burden on everyone due to her inability to work. (R. at p. 485). She explained that "the pain get to be too much," and that she is "always anxious and fearful . . . to leave the bedroom[,] . . . to eat", or that "something will happen to her teenage kids or pets." (Id.). Carter complained of panic attacks which had been occurring since October. (Id.). She felt she was "losing it," and that everyone was looking at her and judging her. (R. at p. 486). During the discussion, Carter mentioned her February 14, 2013 disability hearing. (R. at p. 485). Myers noted that Carter was "constantly shaking/tapping." (R. at p. 486). She also recorded Carter's marijuana usage to be "1 joint/wk," which "helps with pain/nausea." (R. at p. 487). Carter's last marijuana usage was recorded to have been "last [weekend]." (Id.).

After her discussion with Meyers, Carter explained that she "felt that she would never act on thoughts to harm self." (R. at p. 488). Instead, "she just wanted to feel better and had . . . felt better as recently as early December." (Id.). Carter agreed that she should see a psychiatrist and a therapist, but denied any knowledge of having been diagnosed with bipolar. (Id.). After more than six hours, Carter was discharged based on the belief she was no longer suicidal. (R. at pp. 470, 76-77). She was diagnosed with a severe single episode major depressive disorder and anxiety disorder, assigned a global assessment of functioning ("GAF") score of 25, and given an urgent referral to the Staunton Clinic (R. at p. 488).

The medical evidence of record reflects two visits to Staunton Clinic by Carter. (R. at pp. 450-59). Carter was initially seen on January 17, 2013. (R. at pp. 452-59). During this visit,

Carter discussed her fear that others are judging her due to her "paralyzing" anxiety. (R. at p. 452). She discussed feeling overwhelmed and tired of dealing with pain, and explained that she feels unable to leave the house and does not eat consistently. (Id.). She was also fearful that someone was going to break into her home. (R. at p. 453). Carter disclosed "that she uses marijuana daily to help cope with her chronic pain." (Id.). The therapist noted that Carter had tremors, (R. at p. 454), but observed that "they seemed to disappear when [Carter] was focused and calmly talking," (R. at p. 457). Ultimately, Carter was given a GAF of 49, and diagnosed with the following: (1) "Bipolar I, mixed severe without psychotic features," (2) "generalized anxiety disorder," (3) "social phobia," and (4) "cannabis abuse." (R. at p. 455).

Carter's second visit to Staunton Clinic occurred on January 22, 2013. (R. at p. 451). In addition to echoing the concerns she voiced during her prior visit, Carter mentioned "increased fights with her husband and family." (Id.). Carter further disclosed that she had "started scratching and punching herself to divert thoughts of anxiety and pain." (Id.). Carter's GAF during this visit was measured at 50. (Id.).

### D. The Administrative Hearing

At the hearing before the ALJ on February 14, 2013, Carter testified that she was experiencing "a sharp, stabbing, ache", which she would rate at an intensity of ten out of ten. (R. at pp. 80-81). The least intense she experiences on a daily basis would rate as a six. (R. at p. 81). She can either sit or stand for ten to fifteen minutes before having to lie down. (R. at pp. 80-81). She also testified to being capable of lifting less than five pounds, based on the fact that she cannot lift a ten-pound bag of cat litter. (R. at p. 82). Concerning her mental health problems, Carter testified about resulting difficulties with concentrating, communicating effectively, and fearful thoughts of people breaking into her house. (R. at pp. 87-88).

When questioned by the ALJ, Carter denied any drug or alcohol abuse, and denied any use of illegal substances. (R. at p. 92). However, in response to later questioning by her counsel, Carter testified to using marijuana as late as 2010, and explained that she thought the ALJ was asking if she "had a substance abuse problem." (R. at pp. 95-97). She testified that her discussions about marijuana use reflected in her medical records from Staunton Clinic were all related to past use of the drug. (R. at pp. 96-97). Concerning tremors she was demonstrating during the hearing, Carter explained that she had sought treatment with Gates in June of 2012 when the severity was milder. (R. at p. 93). Also, of note, Carter's counsel renewed his request for a psychological consultative evaluation at the close of his questioning. (R. at p. 96). However, he did qualify that request by stating, "I don't know if Your Honor will feel that's necessary now since she has been to Staunton Clinic." (Id.). The ALJ responded that he would "take that under advisement and make the decision at another point-in-time." (Id.).

### E.    The ALJ's Opinion

After consideration of the above, as well as testimony by vocational expert Edelmann, the ALJ determined that Carter was not "disabled" within the meaning of the Act. (R. at p. 61). The ALJ determined that Carter had the following severe impairments: degenerative disc disease of the lumbar spine; fibromyalgia; osteoarthritis; obesity; bipolar disorder; general anxiety disorder; and cannabis abuse. (R. at p. 53). Based on these impairments, the ALJ determined that Carter has the residual functional capacity ("RFC") to:

> Perform light work as defined in 20 C.F.R. § 404.1567(b) and
> 416.967(b), as she is able to stand and walk for a combined total of
> 4 hours, while sitting for up to 6 hours, each in an 8-hour work
> day, except that she must be permitted to alternate sitting and
> standing, at will throughout the day. Additionally, [Carter] can
> perform only occasional balancing, bending, stooping, crawling,
> crouching, kneeling and climbing of stairs, and she is precluded
> from ever climbing ladders, ropes or scaffolds. Further, she must

avoid concentrated exposure to temperature extremes of cold and
heat, as well as wetness, humidity and vibration, and she needs to
avoid exposure to hazards, such as unprotected heights and
dangerous machinery. Finally, [Carter] can perform only simple,
routine and repetitive tasks in a low stress work environment,
defined as one involving only simple related tasks, with few
changes in a routine work setting.

(R. at pp. 55-56). Based on this RFC, the ALJ determined that Carter could not perform any past

relevant work. (R. at p. 60). However, based on testimony by Edelmann, Carter could perform

jobs existing in significant numbers in the national economy, including assembler, packer, and

sorter-grader. (R. at p. 61).

In formulating the RFC, the ALJ found Carter's testimony as to the intensity, persistence

and limiting effects of her symptoms to be not entirely credible given the following. First,

Carter's testimony concerning marijuana use conflicted with her medical records. (R. at p. 57).

Second, Carter testified to Gates taking action with respect to her current tremor condition as

early as June of 2012, (R. at p. 93), but her medical records contain no reference to his treatment,

or even recognition, of tremors, (R. at p. 58). Further, the ALJ observed that her tremors stopped

when Carter gestured with her hands, (R. at p. 54), consistent with therapist observations at

Staunton Clinic, (R. at p. 457). Third, the ALJ found that the five-month gap in Carter's

treatment from January 2011 until June 2011, during nearly all of which she apparently

discontinued all medications, "undermines the credibility of her testimony regarding the chronic

and extreme nature of her pain." (R. at p. 58). Fourth and finally, the ALJ found the timing of

Carter's visit to the emergency room with suicidal ideations to be "suspicious of being motivated

by pecuniary gain," given its proximity in time to the February 2013 administrative hearing. (R.

at p. 59).

The ALJ also gave "little weight" to the December 6, 2011 assessment by Gates when formulating the RFC. (R. at p. 59). In doing so, the ALJ found that opinions stated by Gates within it were inconsistent with other substantial evidence in the record and "unsupported by medically acceptable clinical and laboratory diagnostic techniques." (Id.). Instead, the ALJ gave significant weight to the functional assessments by Reardon, which he found to be "consistent with the record, as a whole." (R. at pp. 59-60).

III.    **Standard of Review**

This Court's review is plenary with respect to all questions of law. Schaudeck v. Commissioner of Social Security Administration, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health & Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his ultimate findings, an ALJ must do more than simply state factual conclusions.  He must make specific findings of fact.  Stewart v. Secretary of Health, Education & Welfare, 714 F.2d 287, 290 (3d Cir. 1983).  The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. Weir on Behalf of Weir v. Heckler, 734 F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the

impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. McCrea v. Commissioner of Social Security, 370 F.3d 357, 360-61 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196 (1947) (if the "grounds [relied on by the agency] are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."). The Third Circuit Court of Appeals has recognized the applicability of this rule in the Social Security disability context. Fargnoli v. Massanari, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. Cefalu v. Barnhart, 387 F.Supp.2d 486, 491 (W.D. Pa. 2005).

## IV.    Discussion

Carter raises two arguments for summary judgment in her favor. First, she argues that the ALJ failed to sufficiently develop the record by ordering a consultative psychiatric examination, given the lack of any medical source opinion as to Carter's resultant functional capabilities. (ECF No. 12, at pp. 3-9). Second, Carter contends that the ALJ failed to adequately

support his decision to assign less than controlling weight to Gates residual functional evaluation. (Id., at pp. 10-13). Neither of these arguments is compelling.

### A. Substantial evidence supported the ALJ's mental RFC

"Although the burden is upon the claimant to prove his disability," Hess v. Sec'y of Health, Ed. & Welfare, 497 F.2d 837, 840 (3d Cir. 1974), "ALJs have a duty to develop a full and fair record in social security cases," Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995). Sometimes this duty requires the ALJ to "arrange for consultative examinations if the information needed is not readily available from the claimant's treatment sources." Schwartz v. Halter, 134 F. Supp. 2d 640, 657-58 (E.D. Pa. 2001) (citing 20 C.F.R. §§ 404.1512, 416.912). However, "the ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." Thompson v. Halter, 45 F. App'x 146, 149 (3d Cir. 2002). In any case, "[t]he decision to order a consultative examination is within the sound discretion of the ALJ." Id.

Here, Carter argues that the ALJ's duty to fully develop the record dictated that a consultative psychological examination be ordered, as there was no medical source opinion in the record to speak to functional limitations which flowed from Carter's mental impairments. (ECF No. 12, at p. 5). She relies on an opinion of the United States Court of Appeals for the First Circuit for the proposition that, "[w]here the record is bereft of any medical assessment of residual functional capacity," an ALJ's RFC formulation is not based on substantial evidence. (ECF No. 12, at p. 6 (citing Rodriguez v. Sec'y of Health & Human Servs., 893 F.2d 401, 403 (1st Cir. 1989)). However, the Third Circuit Court of Appeals has found that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course

of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). As such, an "ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) ("the regulations do not require ALJs to seek outside expert assistance.") (citing 20 C.F.R. §§ 404.1546(c), 404.1527(e); SSR 96–5p (July 2, 1996)). The ALJ's decision here to forego a consultative psychological examination was thus not rendered improper by the record's lack of medical opinion concerning Carter's relevant capabilities.[3]

In the absence of a consultative psychological examination, the record considered by the ALJ still contained the following evidence related to Carter's mental impairments. First, medical records from Gates reflect that he had been treating her for anxiety and bipolar disorder with medication since May 11, 2012. (R. at pp. 438, 42, 43, 45, 47). Second, records from Carter's January 15, 2013 visit to the emergency room at Sewickley Hospital and from her visits to Staunton Clinic on January 17 and 18 reflect in-depth discussion of Carter's mental impairments

---

[3] Carter argues that the ALJ's mental RFC was improper in light of the Third Circuit Court of Appeals' decision in Doak v. Heckler, 790 F.2d 26 (3d Cir. 1986). (ECF No. 12, at p. 12 n.1). This decision is inapposite. In Doak, three physicians of record gave opinions that the claimant was capable of no more than sedentary work, and none suggested he could perform light work. Doak, 790 F.2d at 29. The ALJ disregarded this medical evidence to formulate an RFC which found the claimant could perform light work. Id. The Doak court held, "[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence." Id. This holding was entirely consistent with the requirement that an ALJ not reject or render a decision conflicting with a claimant's uncontradicted medical evidence without sufficient explanation. See Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) (citing Schaaf v. Matthews, 574 F.2d 157 (3d Cir. 1978) ("it was error for an ALJ to reject uncontradicted medical evidence without a clear statement of the reasons for doing so."). As this Court has previously explicated, the Doak court did not create "a rule that an RFC determination must be based on a specific medical opinion." Doty v. Colvin, 2014 WL 29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014). Doak is consistent with and entirely different principle and is distinguishable from the instant facts, as there are, subjudice, no medical opinions of record which contradict the ALJ's mental RFC of Carter.

at the time period immediately before the administrative hearing. (R. at pp. 450-59, 467-93). Even Carter's counsel recognized at the hearing that the ALJ may not find a psychological consultative examination "necessary now since she has been to Staunton Clinic." (R. at p. 96). Third, Carter herself testified as to the specifics of her mental impairments at the February 14, 2013 administrative hearing. (R. at pp. 83-88, 91, 94). Given the presence of all of this relevant evidence, the ALJ decision not to order a consultative psychological examination was not an abuse of his discretion.

"In making a residual functional capacity determination, the ALJ must consider all evidence before him." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). Here, it is clear that the ALJ considered the treatment records discussed above, as the severe mental impairments he recognized at step two of the sequential process were the same conditions Carter was diagnosed with by the Staunton Clinic. (R. at pp. 53, 455). In addition, the ALJ gave Carter the opportunity to explain what limitations she experiences as a result of her mental impairments. She explained that she has difficulty concentrating and finding words when she speaks and is fearful that someone is going to break into her house. (R. at p. 87). The ALJ then addressed Carter's stated limitations with the RFC by restricting her to "only simple, routine and repetitive tasks in a low stress work environment, defined as one involving only simple related tasks, with few changes in a routine work setting. (R. at p. 55-56). Nothing in the record suggests that additional restrictions would be necessary to accommodate Carter's stated limitations. As such, substantial evidence supports the ALJ's RFC finding.

**B.      The ALJ was not required to give controlling weight to Gates' RFC assessment**

"'Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight.' However, the treating

source's opinion is entitled to controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record.'" Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202 (3d Cir. 2008) (quoting Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir.2001) (citing 20 C.F.R. § 404.1527(d)(2))).  "Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

In the instant matter, Carter argues that is was error for the ALJ to reject the December 6, 2011 RFC assessment by Gates, Carter's treating physician, in favor of one by Reardon, the state non-examining consultant.  (ECF No. 12, at p. 10).  The ALJ supported this action by pointing to certain evidence in the record which "contradict[s] the extreme assessment of Dr. Gates," and then by asserting that "the assessments of Dr. Gates are unsupported by medically acceptable clinical and laboratory diagnostic techniques."  (R. at p. 59).  The ALJ was only half right.

With respect to the ALJ's assertion that Gates' assessment was contradicted by other evidence in the record, he only specifically cites to two supposed incongruities.  First, he points to an observation by Lamperski that Carter was "able to function and drive without difficulty," as evidence that her physical condition was not as severe as Gates represented.  (R. at p. 59).  However, the ALJ failed to note that this observation was made in consideration of whether Carter's dose of Fentanyl was appropriate, and was only referring to potential side-effects of the drug.  (See R. at p. 388).  Second, the ALJ refers to the period in early 2011 during which Carter had stopped all medications as inconsistent with the severe pain Gates claimed Carter was in. (R. at p. 59).  Once again, this conclusion ignores relevant information; Carter was without

health insurance for the entire time she was without treatment.  (R. at p. 391).  Considering these supposed contradictions along with the record as a whole, Gates December 6, 2011 RFC assessment, while arguably *extreme*, "is not inconsistent with the other substantial evidence in [Carter]'s case record."  Johnson, 529 F.3d at 202.

The argument that Gates' assessment is not well-supported by medically acceptable clinical and laboratory diagnostic techniques is far more compelling.  As the regulations explain, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  As such, "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."  Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).  Specifically, the reliability of "residual functional capacity reports . . . [which] are unaccompanied by thorough written reports . . . is suspect."  Id.  Here, Gates ignored instructions on the RFC questionnaire, which prompted him to "[a]ttach all relevant treatment notes, radiologist reports, laboratory and test results that have not been provided previously."  (R. at p. 326).  As a result, his collection of responses characterized by checkmarks, circles and shorthand sentences are offered with no explanation or evidentiary support.  (See R. at p. 326-30).  As such, Gates' December 6, 2011 RFC assessment was not entitled to controlling weight, and it was not error for the ALJ to give greater weight to the assessment by Reardon.

**V.**     **Conclusion**

For the foregoing reasons, Carter's motion for summary judgment (ECF No. 10) will be

denied, the Commissioner's motion for summary judgment (ECF No. 13) will be granted, and

the Commissioner's decision will be affirmed.


Dated:  April 23, 2015                               __s/Lisa Pupo Lenihan__
                                                     LISA PUPO LENIHAN
                                                     U.S. Magistrate Judge


cc:     All Counsel of Record